# Gramatan National Bank and Trust Co. v. William H. Beecher et al

[146 A2d 246]

September Term, 1958

Present: **Cleary, C. J., Adams, Hulburd, Holden and Shangraw, JJ.**

Opinion Filed November 5, 1958.

*Waldo C. Holden* for the defendants.

*Earle J. Bishop* for the plaintiff.

**Shangraw, J.** This is an action on a note signed by the defendants as makers payable to the Globe Remodeling Company and endorsed by it to the plaintiff before maturity. The defendants filed an affidavit of defense under county court rule 9 setting up fraud in procuring the note, and signatures thereto, by the Globe Remodeling Company; that plaintiff is not a holder in due course; and that representations made by the Globe company were a part of a general scheme to defraud the defendants, of which plaintiff had knowledge. Hearing was had by the court, findings of fact were made and judgment was for the plaintiff. The case is here on the exceptions of the defendants: (a) to the findings of fact; (b) to the failure of the court to find facts as requested by the defendants; (c) to the admission of evidence; (d) to the exclusion of evidence offered by the defendants; and, (e) to the judgment.

Following are the facts as found by the court and unexcepted to. The plaintiff is the holder of a promissory note signed by the defendants as makers dated October 13, 1953, written for the sum of $1451.88, payable to the Globe Remodeling Co., and endorsed by it to the plaintiff. The note as set forth in the findings of fact provides for its payment in thirty-six monthly installments of $40.33 each, with interest from the expressed or declared maturity at the highest lawful rate. The first installment was payable December 13, 1953. The note contains an acceleration clause providing that in case of default in the payment of any installment the entire unpaid amount shall immediately become due and payable together with 18 percent of the amount unpaid thereon for collection fees. The note was endorsed without recourse and sold to the plaintiff by the Globe Remodeling Company on October 13, 1953 for the sum of $1200. The contract provided for a net cash price of $1200. At the time of the signing of the contract dated September 24, 1953 a representative of the Globe Remodeling Company talked for several hours with the defendant

Jennie F. Beecher, and represented to her that a commission would be paid to the defendants for work performed by the company through the showing of the Beecher house and contacts made by Mr. Beecher, or Mr. Shapero, district manager of the company. A discount certificate dated September 24, 1953 was given to Mr. Beecher by Mr. Shapero on behalf of the company showing a reduction of the price from $1500 to $1200, in consideration of Mr. Beecher allowing his home to be displayed, pictures taken of it, and the use of any pictures taken in the Globe's advertising program. An insurance policy was given Mr. Beecher by the company providing for insurance of payments under the contract with the Globe Remodeling Company in case of death or total disability of Mr. Beecher. When informed that Mr. Beecher's financial condition was poor at the time, the representative of the company promised that the company would make the first two payments on the note. The defendants have made no payments on the note. No claim was made by the defendants for commissions under the agreement from the Globe company, and none were ever paid. No pictures were taken of the Beecher residence. No payments were made under the policy, although Mr. Beecher was in a hospital for some time. The court also found the following acts to which exceptions were taken by the defendants:

"4. That the said note was given to the Globe Remodeling Co. by the defendants under a contract for work to be done on their house by the Globe Co. which contract specified that the net cash price of the contract was $1200.00 (twelve hundred dollars).

"11. That other people, namely, Mr. Barber, Mr. Bishop, Mrs. Jepson, Mr. and Mrs. Millington and Mr. and Mrs. Martin, all in the vicinity of Bennington, also signed contracts with Globe at various times. That none of them received commissions from the Globe Company under agreements with the Globe Company similar to those made with the Beechers.

"13. That the plaintiff took the note in good faith and for value.

"14. That at the time the note was negotiated to the

plaintiff it did not have notice of any infirmity in the instrument or any defect in the title of the person negotiating it.

"17. That the plaintiff is a holder in due course of the promissory note here sued upon.

"18. Defendants are liable to the plaintiff for the unpaid balance of $1330.89, together with interest at 6% from March 13, 1954, plus collection and attorney's fees in the amount of $239.56, plus the costs of this action."

The defendants also took exceptions to the failure of the court to find as requested, numbers 3, 4, 5, 6, 11, and 18 to 43 inclusive, and to the judgment order. In order to better understand our discussion of defendants' exceptions we now summarize the undisputed testimony of Mrs. Beecher and certain other witnesses. On September 24, 1953 the defendants signed an agreement (Def. Ex. "C") with the Globe Remodeling Company whereby this company agreed to apply Johns Manville asbestos siding on their home in Bennington, Vermont. At the time, and prior to their signing, two salesmen of the company, a Mr. Shapero and a Mr. Greene, came to their house and wanted to know if they could take photographs of their home to be used as an advertisement, stating that a photographer was outside in a car. At the time defendants were given a paper, (Def. Ex. "D") signed by Mr. Shapero, as an authorized representative of the company, in part reading as follows:

"A 3% commission will be paid to Mr. Beecher for any jobs sold as a result of showing his house to a prospect and mailing prospect's name to company on company appointment card. 5% commission will be paid to Mr. Beecher for any prospects acquired and contracted by Mr. Shapero and performed by us."

The defendants agreed to allow the company to take pictures of their home to be used by the company in its advertising program, Discount Certificate (Def. Ex. "E"). Before signing the contract defendants were informed by the salesmen that

the company wanted to use these pictures as an advertisement in a magazine. The representative, as testified by Mrs. Beecher said: * * * "an ad in a magazine. I think he mentioned the Saturday Evening Post would cost them $10,000.00. They could make a whole lot more money off a family's home." * * * "It was for the sales they were going to make through the pictures as before they did the job and after. They were going to use both pictures as to what it would do for the home." Referring to the job, "They said it would pay for it and more too. They expected we would make more than enough on the commissions." Defendants were given a Certificate of Insurance (Def. Ex. "F") and by reason of Mr. Beecher's illness the salesman represented that "we would be protected through their insurance company, if it came to that." No photographs were taken, nor did the defendants receive any commission. When interrogated about the note, (Pl. Ex. "1") she was asked to sign by a representative of the company, and informed as she testified, * * "it would be stating that the job was finished." She then declined and in the evening another man from the company called and she was again told as she testified, * * * The Globe Company lets these jobs out to jobbers,—let them out so much for the contract for finishing the work * * ." On cross-examination Mr. Beecher was asked this question. "You didn't look at the paper before you signed it?" A. "No. We took the man's word. He said to sign it, it was to show the job had been completed." The witness further testified, "They said we were going to make money, they were going to make money."

As stated in paragraph 11 of the findings of fact agreements were made with other parties in the vicinity of Bennington similar to those made with the Beechers. Mr. Bishop testified "They offered to do my home. Said they would take pictures before and after it was done." After it was done "they were going to give me payments, the house itself was going to cover the payments. * * * It was going to be the first house in the territory that was done." * * * Commissions to be received "provided any other houses were done." This agreement was made June 23, 1953. Mr. and Mrs. Millington made a similar agreement with the Globe company in the spring

of 1953. Mrs. Millington testified that the Globe Remodeling Company promised "commissions to help pay for the siding." Eleanor Martin contracted with the company for siding in the spring of 1953 and testified that a representative of the company stated "they would use our house as it would be the only one in the neighborhood; that they would use our home as a demonstrator and they would put a sign in the front yard as they did with the rest of them and that the commissions from places sold would more than cover the cost." Edward Barber of So. Shaftsbury, Vermont, testified that he likewise entered into an agreement with the Globe Remodeling Company around January 27, 1953, and was told, as he testified, "He told me if my house was done he would give me a commission on all jobs done to make it much easier for my wife and I." Wilma Campney of Bennington, Vermont entered into a similar agreement with the company in the fall of 1954, testifying that a representative of the company "promised that they would take pictures of the house before and after the siding was put on and that they would use it as an advertisement to get other people to buy their siding and also that I should receive a commission on every house that was * * that siding was put on through having had these pictures taken and anyone I would get to have this done, they would reimburse me for it." No pictures were taken. None of the parties received commissions. All of this testimony is unchallenged.

Mr. Wunder was the only person improved as a witness by the plaintiff. He testified that he was in charge of the collection and purchase of various notes for the plaintiff in the New England area and upstate New York and that at the time the note was purchased he did not have any notice that the note had been dishonored, nor notice of any defects in the title thereto of the Globe Remodeling Company, without however stating any circumstances surrounding its acceptance by the plaintiff.

Before passing upon certain of the exceptions of the defendants we refer to sections of the Negotiable Instruments Act, the construction thereof, and principles of law applicable herein. The defendants generally assert fraud on the part of the Globe Remodeling Company in the inception of the

contract and note, and that there was a general scheme to defraud. It is also claimed that the plaintiff is not a holder of the note in due course. No serious question is made but that the note was complete and regular on its face; that the plaintiff became the holder thereof before the note was over-due; and, that the note was taken for value. The material facts controverted relate to the circumstances of the taking by the plaintiff, that is, whether it was in good faith, and without any notice of any infirmity of the instrument or defect in the title of the person negotiating it. V. S. 47, §5496 in part reads:

> "A holder in due course is a holder who has taken the instrument under the following conditions: * * *
> "III. That he took it in good faith and for value; and
> "IV. That at the time it was negotiated to him, he did not have notice of any infirmity in the instrument or defect in the title of the person negotiating it."

■ We start with the presumption that the plaintiff is a holder in due course. *Howard National Bank* v. *Wilson*, 96 Vt 438, 449, 120 A 889. V. S. 47, §5504 provides: "Every holder is deemed prima facie to be a holder in due course; but, when it is shown that the title of any person who has nego-tiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course; but the last men-tioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such de-fective title."

As to what constitutes notice of an infirmity in a note V. S. 47, §5501 reads: "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect or knowledge of such facts that his action in taking the instrument amounted to bad faith."

The statute relating to defective title of a person who negotiates an instrument is found in V. S. 47, §5499 reading as follows: "The title of a person who negotiates an instrument

is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto by fraud, duress or force and fear or other unlawful means or for an illegal consideration or when he negotiates it in breach of faith or under such circumstances as amount to a fraud."

Neither gross negligence, nor knowledge of suspicious circumstances, nor failure to inquire into the consideration will of themselves, as a matter of law, prevent a recovery by a holder of negotiable paper who purchases it in the ordinary course of business; but as is said in *Arnd* v. *Aylesworth*, 145 Iowa 145, 123 NW 1000, 29 LRANS 638, cited in *Land Finance Corp.* v. *Sherwin Electric Co.*, 101 Vt 114, at page 123, 141 A 598, 601, the authorities are practically unanimous in holding that the "existence of such facts may be evidence of bad faith sufficient to take the question to the jury, and especially is this so where the burden is upon the holder to establish the innocent character of his purchase." *Barre Trust Company* v. *Ladd*, 103 Vt 412, 154 A 680, 689.

The defendants claim fraud in the inception of the contract and note, by reason of the unfulfilled promises made by the Globe Remodeling Company to take pictures of their home and pay commissions. Our law is well settled that false representations or broken promises referring merely to the future do not afford the basis of actionable fraud. *Comstock* v. *Shannon*, 116 Vt 245, 250, 73 A2d 111, and cases cited. While a promise, standing alone, does not afford the basis of actionable fraud, it is not improper to consider broken promises where there was a general scheme to defraud of which the promises were steps in a series of actions constituting the scheme. *Harponola Company* v. *Wilson*, 96 Vt 427, 435, 120 A 895; *Comstock* v. *Shannon, supra,* at page 250, citing *Adams* v. *Soule*, 33 Vt 538, 544; *Wilbur* v. *Prior*, 67 Vt 508, 512, 32 A 474, and *Harponola Co.* v. *Wilson, supra.* A future promise may be fraudulent when it is a part of a general scheme or plan, existing at the time, to induce a person to act, as he otherwise would not, to his injury. 37 CJS, Fraud, §11, pages 235, 236. In urging fraud in the inception of the contract and note the defendants claim, and offered evidence, which was received, tending to

show that the Globe Remodeling Company was, at the time, engaged in other fraudulent transactions of like kind. In the case of *Eastman* v. *Premo*, 49 Vt 355, 360, it was held that evidence of other contemporaneous fraudulent transactions of like kind was admissible. See 11 CJS, Bills & Notes, §674b, page 138.

■■ It is only necessary to mention and dispose of the following exceptions. Exception to finding 11 is here considered with the defendant's exceptions for failure to find 6, relating to assurances given defendants that pictures would be taken of their home for advertising purposes, and that commissions would be received, and, also with defendants' exceptions for failure to find 21 to 39 inclusive, 40 and 41. Exceptions 21 to 39 inclusive relate to requests that similar promises were made to witnesses Barber, Bishop, Jepson, Millington, Martin, and Campney, and that no commissions were paid these parties. That the promises of the company to the defendants and others were never intended to be kept; that the defendants and above parties relied on the promises of the company; and that the promises so made were part of a scheme to defraud. Exceptions 40 and 41 have to do with requests that the promises to defendants contemplated from the outset the note here in issue, and that the note was obtained through the company's scheme to defraud the defendants and others. The defendants excepted to finding 11 on the ground that it fails to set forth the particulars of the transactions involved, with parties therein named, as supported by the uncontradicted testimony of the defendants and others. While the exception to finding 11 standing alone is too general, however it is in effect disposed of by our favorable action on the requests to find enumerated in this paragraph of the opinion. The defendants in their brief call attention to, and rely upon, quoted testimony of the defendant, Mrs. Beecher, and others, heretofore summarized, in support of their exceptions for failure to find as requested. It is true of course, that the credibility of a witness and the weight to be given his testimony are for the determination of the trier, and a court or jury is not bound in all circumstances to believe testimony not directly contradicted. *LaPierre* v. *Halpin*, 111 Vt 193, 196,

13 A2d 281.   However statements of a witness are not to be arbitrarily disregarded, *Valenti* v. *Imperial Assurance Co.,* 107 Vt 65, 69, 176 A 413.   In this case the testimony of Mrs. Beecher not only was uncontradicted but to a large extent corroborated by other witnesses.   The same was true of the testimony of all other witnesses improved by the defendants. The evidence required that the above requested findings be made and the exceptions are sustained.

■   When the plaintiff proved the note and it had been received in evidence, it had made a prima facie case on which it could rely until the defendants introduced evidence of fraud in the procuring of the note sufficient to support such a defense if the Globe Remodeling Company was the plaintiff.   Until there was such evidence of fraud in the case, the testimony of Mr. Wunder to the effect that he had no notice that the note had been dishonored, nor notice of any defects in the title, neither added to, nor detracted from the prima facie case. When the defendants introduced evidence sufficient for the consideration of the court, which so appears, tending to show fraud in the procuring of the note, then the burden was upon the plaintiff to prove by a preponderance of the evidence that the plaintiff bought the note in good faith.   *Harponola Company* v. *Wilson, supra; Howard National Bank* v. *Wilson, supra.* As stated in *Howard National Bank* v. *Wilson, supra,* at page 453: "It devolves upon him to disclose the *facts* and *circumstances* attending the transfer, from which good or bad faith in the transaction may be inferred.   The question is generally one of fact for the jury."   As stated in *Land Finance Corp.* v. *Sherwin Electric Co., supra,* at pages 122 and 123: "On this issue the defendant would not necessarily have to produce evidence tending to show a lack of good faith on the part of the plaintiff, but it could rely upon the insufficiency of the plaintiff's evidence.   * * * It is ordinarily to be expected in these cases that the purchaser will testify to his good faith and want of notice, as was done in this case, and that the defendant is compelled to rely upon the circumstances surrounding the purchase and the inferences to be drawn therefrom to rebut such showing."   While it might frequently occur that a defendant would be powerless to prove knowledge of the fraud

in the plaintiff where they were not the immediate parties to the transaction, it would rarely, if ever, be a hardship upon the plaintiff to require him to show good faith by proving the circumstances under which he became the holder of the instrument sued on—facts peculiarly within his own knowledge. *Howard National Bank* v. *Wilson, supra,* at page 451. The plaintiff failed to sustain its burden of proof in this respect.

Without repeating the facts and circumstances, there was evidence tending to show fraud in the procurement of defendants' signatures to the initial contract and ultimately to the note. The representations made by salesmen of the Globe Remodeling Company to Mr. and Mrs. Beecher, and steps taken, followed generally the same pattern as made to others, all as bearing upon a plan or scheme to defraud. The defendants were entitled to the requested findings as indicated in this opinion. Furthermore, in the absence of evidence on the part of the plaintiff disclosing facts and circumstances attending the transfer and its procurement of the note, from which good or bad faith might be inferred, it cannot be said that the court was at liberty on the evidence presented to determine as a matter of law that the plaintiff purchased the note in good faith, or that it was a holder thereof in due course. Error appears.

*The judgment is reversed and the cause remanded.*