VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.     24-AP-267



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

FEBRUARY TERM,   2025

| | |
|---|---|
| In re H.B., Juvenile<br>(A.B., Mother\*) | } APPEALED FROM:<br>}<br>} Superior Court, Windsor Unit,<br>} Family Division<br>} CASE NO. 22-JV-01324<br>Trial Judges: Heather J. Gray, Lisa Warren |

In the above-entitled cause, the Clerk will enter:

Mother appeals the family division's determination that H.B. was a child in need of care or supervision (CHINS) and its subsequent disposition order.  We affirm.

H.B. was born in August 2021.  In September 2022, the State filed a petition alleging that H.B. was CHINS due to mother's suspected use of methamphetamine and untreated mental-health issues.  The court transferred custody of H.B. to the Department for Children and Families (DCF) in an emergency care order, and continued DCF custody following a temporary care hearing.  A contested merits hearing was held over three days in January, March, and May 2023.

In a written order issued in August 2023, the court found the merits of the CHINS petition to be established.  The court found that during mother's pregnancy, she was concerned about postpartum depression due to her family history.  After H.B. was born, she sought assistance from friends and family to care for him.  Mother's stepmother lived in mother's house from March to July 2022.  She observed mother's behavior becoming erratic.  Mother would be fine one minute and then yelling and screaming the next.  Mother hosted various people in her home who were struggling with substance abuse.  Mother tried to assist them with recovery, although she did not have any training or education in that field.  At the end of July 2022, stepmother observed one of these individuals fighting with law enforcement at mother's home and refusing to leave the residence.  Stepmother did not speak to mother after July 2022.  Another relative helped mother care for H.B. three to four nights a week during the spring of 2022.  When the relative went to pack up her things to move out in July 2022, she found needles in her bed.

Mother's sister lived with mother for a period and provided care for H.B. on a weekly basis.  Mother sent the sister a text message stating that mother was "likely to end up tripping and falling, hitting H.B.'s head off the counter."  This concerned the sister, who returned from a trip to Cape Cod to check on mother and H.B.  The sister observed a methamphetamine bong in a

drawer on the porch of mother's home in August 2022. At another point she saw the bong in mother's kitchen. The sister observed many individuals whom she knew to be active drug users caring for H.B. at different times. She did not see any of them provide primary care for H.B. while intoxicated, but at times they would be under the influence when H.B. was in the home.

Mother placed H.B. in the care of two friends, both of whom were in recovery for substance-use disorders, while she recuperated from H.B.'s birth. The friends eventually cared for H.B. four to seven days a week. Mother occasionally provided diapers but otherwise the friends provided for all of H.B.'s needs. The friends also observed H.B. to be in the care of active drug users at times when they picked him up from mother's home.

In the spring of 2021, mother began working with a family-support worker at the Family Place for prenatal support. Mother saw the worker twice a week. The worker visited mother's home, which appeared to her to be safe, and she never observed H.B. to be unsafe. However, in the spring of 2022, the worker noticed that mother had lost weight and had scabs on her face. Mother told the worker that she had tested positive for meth but denied using it. She did not explain why she took a drug test. The worker reported mother's statement to DCF. Mother later told the worker that she suspected that her sister "put meth in the condiments" and would no longer be having her sister care for H.B.

The court found that mother, H.B.'s sole custodial parent, had created an unsafe environment for H.B. by allowing various people who were struggling with substance use to be in and out of her home. Although she had good intentions in seeking help from others, she was unable to provide primary care for H.B. and had left him with various people for extended periods without making any formal arrangements for his care, such as a guardianship. The court therefore concluded that H.B. was without proper parental care necessary for his well-being.

A disposition hearing was initially scheduled for September 2023. However, mother's attorney moved to withdraw shortly before the hearing was to take place, and the court granted her motion. The disposition hearing was eventually held over three days in March, April, and July 2024. During this time, mother's second attorney requested and received permission to withdraw. The court also ordered mother to undergo a competency evaluation, which concluded that mother was "marginally mentally competent" to participate in the CHINS proceeding.

Following the conclusion of evidence, the court issued a disposition order in August 2024 that continued DCF custody, adopted the case plan proposed by DCF, and set a permanency goal of reunification with mother by October 2024.

On appeal, mother first argues that the evidence and findings were insufficient to support the court's determination that H.B. was CHINS. A child is CHINS if he or she is "without proper parental care or subsistence, education, medical, or other care necessary for [the child's] well-being." 33 V.S.A. § 5102(3)(B). The State has the burden of proving that a child is CHINS by a preponderance of the evidence. Id. § 5315(a). "On review, we will uphold the trial court's findings unless they are clearly erroneous, and the court's legal conclusions will stand when supported by the findings." In re A.O., 2023 VT 54, ¶ 9 (quotation omitted). We defer to the family division's assessment of the credibility of witnesses and the weight of the evidence. In re M.E., 2019 VT 90, ¶ 12, 211 Vt. 320.

Mother argues that there was no evidence that H.B. was at risk of serious physical injury or that he was actually harmed when in her custody. Mother points to the definitions of "harm" and "risk of harm" in the child-protection registry statute and argues that the findings of the court

do not meet those definitions. See 33 V.S.A. § 4912(6), (14) (defining "harm" to mean physical injury; emotional maltreatment; failure to supply adequate food, clothing, shelter, or medical care; or abandonment; and defining "risk of harm" to mean "a significant danger that a child will suffer serious harm by other than accidental means, which harm would be likely to cause physical injury, or sexual abuse"). However, these definitions do not govern the CHINS proceeding; they are applicable solely to the child-protection registry statute, which has different procedures and goals. See In re L.M., 2014 VT 17, ¶ 29 & n.3, 195 Vt. 637 (affirming CHINS finding and declining to rely on statutory definitions in 33 V.S.A. § 4912 because registry and juvenile proceedings have different goals). The court was therefore not required to find behavior that met these definitions.

"[T]he focus of a CHINS proceeding is the welfare of the child." In re B.R., 2014 VT 37, ¶ 13, 196 Vt. 304 (quotation omitted). Contrary to mother's claim, a showing of actual harm to the child is not required to support a CHINS determination. See E.J.R. v. Young, 162 Vt. 219, 223 (1994) (explaining that "[a]ctual and completed harmful acts cannot be, and are not, a precondition to a CHINS finding"). The court's findings that mother invited active drug users to stay in her home and look after H.B., had unsecured drug paraphernalia in her home, was unable to provide primary care for H.B., and placed infant H.B. in the care of friends for extended periods of time without making any formal arrangements were sufficient to support its conclusion that H.B. was without proper parental care at the time the petition was filed. While mother argues that she was simply being responsible by placing H.B. in the care of other trusted adults, this arrangement allowed her to remove him from their care at any time and did not empower those individuals to seek medical or other care for H.B. if he needed it. The court could "draw upon its own common sense and experience" to conclude that H.B. was at risk of harm under these circumstances. Payrits v. Payrits, 171 Vt. 50, 53 (2000).

Mother also argues that the court erred in approving a case-plan requirement that she complete a substance-abuse assessment because she objected to this requirement below and the evidence did not show that she had a substance-use disorder. We review a court's disposition order adopting a case plan for abuse of discretion. In re L.T., 149 Vt. 473, 476 (1988). We see no abuse of discretion here. The court explained that the CHINS petition was partly based on reports that mother was using methamphetamine. During the pendency of the case, DCF had requested urinalysis from mother nine times, and mother had complied only twice. The first test, in December 2022, was inconclusive, and the second test, in June 2023, showed that mother had a significant quantity of methamphetamine in her system. Mother had frequently appeared late or not shown up at all for family time visits with H.B. She had not been willing to sign releases or work with DCF. Under these circumstances, the court concluded that a substance-abuse assessment was necessary to determine mother's needs. The court's order adequately explains its reasoning for imposing this requirement and why it is "needed to correct the problems necessitating State intervention." 33 V.S.A. § 5316(b)(5).

Mother argues that a psychiatric nurse practitioner who treated her testified that mother "did apparently do some laboratory work in November which revealed that she was not on psychoactive substances." The nurse practitioner concluded that mother's behaviors were not caused by drug use. The court was free to give the nurse practitioner's opinion little weight given the other evidence of drug use in the record. See Gilbert v. Davis, 144 Vt. 459, 461 (1984) ("When the evidence is conflicting, the credibility of witnesses, weight of the evidence and its persuasive effect are matters for the exclusive determination of the trier of fact."). Moreover, even if mother's drug use was not the primary reason for the circumstances that led to state intervention, the court could reasonably conclude that it was at least a compounding factor in her

inability to properly care for H.B. and therefore acted within its discretion in determining that a substance-abuse assessment was necessary to facilitate reunification.

Affirmed.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice

_____
Karen R. Carroll, Associate Justice

_____
Nancy J. Waples, Associate Justice

4