NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 120

No. 2015-170

| | |
|---|---|
| In re M.O., Juvenile | Supreme Court |
| | On Appeal from<br>Superior Court, Bennington Unit,<br>Family Division |
| | July Term, 2015 |

William D. Cohen, J.

Matthew F. Valerio, Defender General, and Rebecca Turner, Appellate Defender, Montpelier, for Appellant Father.

William H. Sorrell, Attorney General, and Bridget C. Asay, Solicitor General, Montpelier, and Martha E. Csala, Assistant Attorney General, Waterbury, for Appellee.

PRESENT: Dooley, Skoglund, Robinson and Eaton, JJ., and Burgess, J. (Ret.), Specially Assigned

¶ 1.     **ROBINSON, J.**  Father appeals from the trial court's finding that newborn M.O. was a child in need of care or supervision (CHINS).  He argues that that the court's findings do not support its conclusion.  We affirm.

¶ 2.     M.O. was born on December 14, 2014.  Mother was twenty-one years old at the time; father was thirty-four.  On December 17, 2014, the Department for Children and Families (DCF) filed a petition alleging that M.O. was CHINS.  It sought emergency custody of the child.  In the accompanying affidavit, a DCF social worker asserted that DCF had received a report from hospital staff expressing concern about parents' ability to adequately care for M.O.  The

court issued an emergency care order on December 17, 2014, and transferred temporary custody to DCF.

¶ 3. Following an April 2015 merits hearing, the court ruled that M.O. had been CHINS on December 14 through December 17, 2014. The court made findings on the record as follows. A nurse home visitor with the Nurse Family Partnership worked with mother prior to M.O.'s birth. This nurse found mother to be engaged in the preparation process for the baby's arrival and capable of following directions. The nurse had concerns about clutter in the home, which would present a hazard for a toddler but not an infant. There were other issues with the home that needed to be resolved as well. Father was not as engaged in the prepartum-planning process as mother. The nurse recognized that while mother seemed to be progressing well with pre-birth preparation, things would be much different once the baby arrived. The nurse testified that in hindsight, given her greater experience, she would have contacted DCF at a much earlier date to engage in safety planning so as to minimize any potential risks to the child.

¶ 4. The court found that at the hospital, a social worker personally observed mother's lack of parenting ability. The social worker was concerned that mother was easily distracted, possibly because DCF was getting involved. Mother was unable to follow directions, possibly as a result of recently giving birth. The social worker had little confidence that mother could care for M.O. without some clearly defined assistance at all hours of the day. The court found that this presented a huge risk factor for the child. No one contested that mother wanted to appropriately parent the child, and father also appeared to want to parent appropriately, although that was somewhat unclear. Nonetheless, relying largely on the postpartum observations of the hospital social worker, the court concluded that M.O. was CHINS. In its written order, the court reiterated that mother was having difficulty performing parenting skills, that there were issues

2

with parents' housing situation as well as anger issues, and that mother needed some assistance.[1] Father appealed from the court's CHINS determination.

¶ 5.     Father argues on appeal that the court's findings are too vague to support its conclusion that M.O. was CHINS.  He asserts that, at most, the court's findings reflected speculation that there was a potential higher risk of harm to M.O. because M.O.'s parents had unidentified "risk factors."  According to father, there was nothing in the court's findings about the prenatal nurse visits or the hospital social worker's testimony that would establish the basis for a CHINS finding.  Father maintains that a potential risk of harm to M.O. is not enough.  Father also contends that the court failed to make sufficient findings to enable us to review its decision.

¶ 6.     A child is CHINS if he or she "is without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being."  33 V.S.A. § 5102(3)(B). "The focus of a CHINS proceeding is the welfare of the child.  The State must prove, and the court must determine [by a preponderance of the evidence], if the allegations in a CHINS petition have been established."  In re B.R., 2014 VT 37, ¶ 13, 196 Vt. 304, 97 A.3d 867 (quotation marks and citation omitted).  A child need not suffer "actual harm" before he or she can be adjudicated CHINS.  In re L.M., 2014 VT 17, ¶ 29, 195 Vt. 637, 93 A.3d 553.

¶ 7.     In reviewing the court's decision, "[w]e must read the evidence in support of the findings if reasonably possible, when considered as a whole."  Seaway Shopping Ctr. Corp. v. Grand Union Stores, Inc., 132 Vt. 111, 117, 315 A.2d 483, 487 (1974) (quotation omitted).  We will construe the findings to support the judgment if they may reasonably be so construed.  First Vt. Bank & Trust Co. v. Vill. of Poultney, 134 Vt. 28, 35-36, 349 A.2d 722, 728 (1975).  The

---

[1]  In making oral findings on the record, the court indicated that it was applying a preponderance standard.  In its subsequent written form order, the court checked a box indicating that its determination that the child was CHINS was made by clear and convincing evidence. Because a CHINS determination may be based on a preponderance of the evidence, this discrepancy does not affect our analysis of the issue before us in this appeal.

court's findings will stand unless clearly erroneous, and its legal conclusions will stand when supported by the findings. In re D.D., 2013 VT 79, ¶ 34, 194 Vt. 508, 82 A.3d 1143.

¶ 8. This is a difficult case—both because the evidence is close, and because the trial court's findings were less thorough than would be optimal. However, while the court might have made more extensive or more precise findings, they are sufficient to show what was decided and why, see Molleur v. Molleur, 2012 VT 16, ¶ 15, 191 Vt. 202, 44 A.3d 763, its decision is supported by the evidence. The court relied primarily on the social worker's observations of mother with the child after the birth. The meaning of the court's analysis is evident and readily ascertained from the record of the social worker's testimony. Based on mother's demonstrated deficiencies in caring for the child after he was born, the court credited the hospital social worker's lack of confidence that mother could care for M.O. without clearly defined assistance at all hours of the day.

¶ 9. The court's findings and conclusions are supported by the record evidence. The nurse who visited with mother before she gave birth testified that even though mother could put a diaper on a doll, things would be very different once the baby arrived. The nurse "could project how things might be," and she felt parents "were going to need a lot of help." She was unsure if parents would be able to care for the child independently and she anticipated that she would need to "wrap around tons of services and to probably call DCF at some point after the baby arrived." Because the baby had not yet been born, the nurse did not think she could "make [mother] guilty before she proved herself." As the court found, the nurse testified that in hindsight, she should have contacted DCF and others before the baby was born.[2]

---

[2] The visiting nurse also testified to concerns about verbal abuse of mother by father in the home. Mother had screened positive for depression and anxiety and also for inter-partner violence. The nurse described an incident where she was on the phone with mother while mother and father were in an argument. The nurse was so concerned about mother's safety that she contacted adult protective services and the state police to conduct a wellness check. Verbal abuse was a frequent subject of discussion between the nurse and mother, and both before and after the baby was born, the nurse had witnessed father angry and yelling. The trial court did not

4

¶ 10.  The social worker described that she had received an order from one of the hospital nurses to assess mother's ability to provide parenting skills to M.O.  She reviewed the nursing notes with respect to mother, and these notes were admitted into evidence at the hearing.  The notes reflect that mother repeatedly expressed fear of being alone, her own assessment that she was unable to take care of the baby without assistance, and her repeated requests for help caring for M.O.  Several times, she needed cueing to check M.O's diaper, help changing the diaper, and help dressing the infant.  At one point M.O. was found crying in the crib and mother did not wake up; she required repeated verbal stimulation before she heard M.O. crying.  Even with coaching, she was unable to position M.O. properly for bottle feeding, and she was very hesitant about holding M.O. and quite flustered when he cried.  When mother was left alone with M.O., she would ask the nursing staff to come in and stay with her or she would ask that M.O. be brought to the nursery because she was afraid to be alone with him.[3]  The social worker tried to assess father but was unable to do so as father was not at the hospital during the times she was present.

¶ 11.  The social worker met with mother several times and discussed, among other things, mother's cognitive limitations and her ability to parent and care for M.O.  The social worker testified that on several occasions she would try to explain something to mother and after explaining it three or four different ways, mother still did not understand.  This included instructions on how to feed the baby.  The social worker also witnessed mother trying to feed the baby, which did not go well.  Mother was not focused on the baby, who was having difficulty swallowing.  Mother did not recognize that this was happening and even when it was pointed out

_____

make any oral findings suggesting that this concern about violence underlay its CHINS determination, but in its written order the court did identify "the housing situation and anger issues" as among the bases for its findings of fact.

[3]  The trial court stated that it did not place significant weight on the nursing notes in reaching its conclusion.  However, the hospital social worker, on whose opinion the trial court placed great weight, did consider these nursing notes in forming her opinion.

to her, she continued to feed the baby improperly. The hospital nurses had observed this same problem. The social worker contacted DCF and reported that although mother was trying to parent, she was unable to retain the information necessary to enable her to do so. The social worker spoke with mother about going to the Lund Center, where she could get around-the-clock help, but mother was not interested. The social worker testified that mother was not able to care for M.O. independently while at the hospital.

¶ 12. The court's findings are supported by this evidence. As reflected above, the visiting nurse's general pre-birth concern that parents would not be able to parent the child without significant help was validated by the social worker's actual observations once the baby was born. Mother's inability to feed a baby, or perform other necessary tasks, without around-the-clock assistance from others is sufficient to show that M.O. was at a risk of harm. The court's conclusion is adequately supported by its findings and by the record.

¶ 13. We reject father's argument that the evidence merely shows a "potential" risk of harm rather than an actual risk of harm. The court did not base its determination on inchoate concerns about mother's ability to parent M.O. safely that rested on broad generalizations about mother's "risk factors," divorced from her actual observed parenting conduct. Rather, the court made its determination on the basis of eyewitness testimony describing mother's demonstrated limitations in safely parenting this child. The risk to M.O. that drove the court's decision was neither speculative nor hypothetical; it was based on evidence of mother's actual parenting after the child's birth.

¶ 14. We emphasize that, contrary to father's characterization of the facts, the evidence here suggests something far more serious than garden-variety new-parent jitters. Even after many months of prenatal coaching, mother was not attuned to M.O.'s cues, and could not perform basic parenting tasks such as holding the baby, feeding the baby, and checking and changing the baby's diaper. And the evidence before the court was that simple coaching of

6

mother by professionals in the hospital would not be enough to ensure M.O.'s safety. The social worker testified that even after she explained to mother several different ways how to feed M.O., mother could not do it.

¶ 15. We need not decide whether and to what extent the existence of other supports for the new parents can avert a CHINS finding where a parent is unable to parent independently. In this case, the evidence was that at the time of the child's birth, the wrap-around services that the visiting nurse thought were necessary were not in place. And the social workers' testimony, on which the court relied, is that mother required round-the-clock support to parent M.O. safely.

¶ 16. We similarly reject father's suggestion that the court based its decision on a presumption that parents with disabilities cannot parent. The trial court did not base its determination on any presumptions arising from mother's self-described learning disability, or her observed cognitive limitations. It based its determination on her observed parenting ability. Finally, father did not argue below that M.O. was not CHINS because DCF failed to accommodate any disabilities that he or mother may have, and so we do not address this argument. See Bull v. Pinkham Eng'g Assocs., 170 Vt. 450, 459, 752 A.2d 26, 33 (2000) ("Contentions not raised or fairly presented to the trial court are not preserved for appeal."). We have considered all of father's arguments and find them without merit.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 17. **DOOLEY, J., concurring.** I concur in the decision of the majority. Under the statute, a child is in need of care or supervision (CHINS) if the child "is without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being." 33 V.S.A. § 5102(3)(B). This is a very broad definition. Many more children meet that definition

than the number who have been declared CHINS and are in the custody of the Department for Children and Families (DCF). In fact, I think it is very likely that the number of children who fit within that standard is a multiple of those committed. That is particularly true in low-income families where the best parenting in the world cannot overcome the lack of money for food, shelter, and clothing.

¶ 18. A result of the broad standard is to give DCF tremendous discretion in determining when and how to intervene to protect a child. The most serious intervention is to take custody of a child, a step that requires court approval. There are many possible less-serious interventions, including the extension of services particularly to a willing parent.

¶ 19. The available choices have become increasingly more restricted because of the vast increase in the need for child protection where one or more parents are engaged in drug abuse. Caseloads have risen dramatically in the last couple of years, and DCF staffing has not kept apace. The competition for DCF resources is more fierce than at any time in the past.

¶ 20. This case does not fit the current paradigm for DCF intervention to take custody of a child. This is mother's first child. The social worker for DCF described the situation prompting the CHINS petition as follows:

> DCF received a report from Southwestern Vermont Medical Center (SVMC) staff expressing concern regarding [mother's] and [father's] ability to care for [M.O.] due to their cognitive disabilities. It was reported that both parents are cognitively impaired and receive disability for learning impairments. [Mother] was reported to read at a 2nd or 3rd grade level. [Mother] reportedly worked with a nurse from the Family Partnership . . . for 14 weeks prior to [M.O.'s] birth to prepare her for labor and basic newborn care. Since [M.O.'s] birth [mother] has been very anxious if someone isn't in the room with her and at times does not know what to do for [M.O.]. It was reported that if something happens that [mother] hasn't already done several times, she needs prompting on what to do and SVMC staff has been providing her with extra support.

¶ 21. The affidavit is dated three days after M.O. was born and apparently when M.O. and mother were still in the hospital. It reports instances where mother said she could not care

for M.O. and herself. It also reports that mother became consumed and stressed over DCF involvement and stated she would kill herself if DCF took M.O. away from her.

¶ 22. As far as I know, no judge, either on this Court or the trial courts, is a professional in child protection. I think we all recognize that DCF workers are highly committed, dedicated, and expert professionals required to make difficult decisions on how to proceed best to protect children and support families. Nevertheless, as child protection cases become a larger and larger share of judicial caseloads, judges are thrust into the role of making judgments as to the validity of the state's child-protection actions, as well as acting to protect children and the rights of parents. That somewhat uneasy role prompts this concurrence.

¶ 23. I think DCF and the Legislature need to take a hard look at cases like this one to determine whether there is a way to protect a child in circumstances like this that involve an alternative to DCF custody, particularly DCF custody that is requested three days after the child's birth. In saying this, I am not suggesting that DCF ever abandon its mission to protect children against neglect and abuse. Nor am I suggesting that DCF ignore the needs of the child in this case or that protection of this child will not be intensive and expensive.

¶ 24. The protection and nurturing of this child will consume extensive resources whether DCF takes custody or not. But taking custody imposes costs on all parts of the system and causes delay and uncertainty while all procedures are exhausted, including an appeal to this Court. It is likely to make reunification difficult. There is a substantial chance that mother, who is relatively young, will again become pregnant, and this scenario, if left in its current state, is likely to be played out again. Significantly, mother seems to seek and welcome assistance and services within her capacity to do so.

¶ 25. Beyond this individual case, if we are going to develop complete, timely, and successful responses to the urgent child-protection cases we are seeing as a result of opiate addiction, it is critical to develop less costly interventions for less urgent cases with a lower risk

potential.  I realize that grading child protection cases is an uncertain endeavor, but I think it is very important to Vermont children and families that we try.

_____
Associate Justice