NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 126

No. 2018-118

In re B.C., Juvenile

Supreme Court

On Appeal from
Superior Court, Franklin Unit,
Family Division

September Term, 2018

Nancy J. Waples, J.

Matthew Valerio, Defender General, Marshall Pahl, Appellate Defender, and Ryan K. Krause, Law Clerk (On the Brief), Montpelier, for Appellant Mother.

Sarah A. Baker, Franklin County Deputy State's Attorney, St. Albans, for Appellee.

PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Grearson, Supr. J.,
Specially Assigned

¶ 1. **ROBINSON, J.** Mother appeals from an order of the superior court, family division, adjudicating her son, B.C., a child in need of care or supervision (CHINS). She challenges: (1) the court's admission of evidence of father's out-of-court statements; (2) the court's reliance on findings from a prior CHINS determination; and (3) the sufficiency of the evidence, especially given that B.C. was in the custody of the Department for Children and Families (DCF) when the State filed the petition. We conclude that the family division erred by admitting evidence of father's out-of-court statements, and that without that testimony, and in light of the court's findings with respect to other evidence, the remaining evidence would be insufficient to support a CHINS determination. Accordingly, we reverse the court's order.

¶ 2. B.C. was born on December 31, 2016. Mother has two other children who were removed from her care prior to B.C.'s birth,[1] at which time DCF was providing services to mother and B.C.'s father to address concerns over substance abuse and domestic violence. Within days after B.C.'s birth, the family division granted DCF temporary emergency custody of the infant, and the State filed a CHINS petition seeking a determination that B.C. was without proper parental care necessary for his well-being. See 33 V.S.A. § 5102(3)(B).

¶ 3. After the parties agreed to continued temporary DCF custody, B.C. was first placed with his paternal grandmother. In March 2017, he was transitioned to the home of his paternal aunt and uncle. DCF's plan contemplated reunification with both parents, who at the time intended to co-parent B.C. Through the first two months of 2017, both parents appeared to be making good progress towards reunification. But in mid-March, father relapsed in his substance abuse recovery, and mother represented to DCF that she had separated from father and planned to parent B.C. alone. In the ensuing months, DCF was unclear about whether mother was being fully transparent about her relationship and living situation, and perceived a decline in mother's engagement with the reunification plan.

¶ 4. Hearings on the January 2017 CHINS petition were held on March 16 and April 27 of 2017. During the first week of May 2017, mother canceled a visit with B.C., missed a substance abuse counseling appointment, was arrested for allegedly assaulting father following an altercation at her apartment, and relapsed by using benzodiazepines on one occasion.

¶ 5. The circumstances surrounding the alleged assault, as later found by the family division, were as follows. On May 5, father refused to leave the apartment he had previously occupied with mother after stopping by to pick up his mail and some of his clothing. Mother's

---

[1] Mother's two other children were adjudicated CHINS in a January 2016 order that was admitted as an exhibit at the merits hearing in this case. Approximately a year before the December 2017 merits hearing in this case, one of those children was placed in the conditional custody of the partner of that child's father. In early 2017, mother relinquished her parental rights to the other child, who has since been adopted.

father called the police for help in making father leave. The police responded, but concluded that they had no legal grounds to remove father from the apartment and advised mother to initiate an eviction proceeding. Two or three hours later, mother called her own father back crying. She reported that father had just thrown a coffee table at her, breaking a window and almost hitting her. Mother's father returned to the apartment and saw a coffee table with glass shards in it. He again called the police, and the police returned to the residence. They spoke with father again, and concluded they could not make him leave the residence. Mother and her father then went to the police station to seek a relief-from-abuse order. They completed a petition, but the dispatcher declined to accept it.

¶ 6. The next morning, when the individual who was to supervise mother's visit with B.C. arrived at mother's apartment to pick mother up, father was still at the apartment. The visitation supervisor told father to leave because he could not be present when mother had B.C. at the apartment. The supervisor left without mother to pick up B.C. When she returned to mother's apartment with B.C. shortly after 9:00 a.m., father was just leaving; the supervisor remained in her car with the child until father went up the street. Then the supervisor brought the child into the apartment and locked the door, and mother and B.C. began what the visit supervisor observed to be a "totally normal" visit. Around 10:30 a.m. that day, the police responded to a report that a man had been stabbed. They found father near a grocery store parking lot, and observed a stab wound on father's chest and a shallower laceration on his back. Father reported that mother had stabbed him. While mother was still visiting with B.C., the police returned to her apartment and arrested her. She was released from jail two days later, on May 8.[2]

_____

[2] As the family division noted, mother's father testified that father had threatened to stab himself and accuse mother of doing it if they kept calling the police on him. However, the court neither credited nor rejected this testimony. Krupp v. Krupp, 126 Vt. 511, 514 (1967) ("A recitation of evidence in findings is not a finding of facts contained in the testimony related and it cannot be so construed.").

¶ 7. On May 17, 2017, while its initial petition was still under advisement, the State filed a new petition alleging that B.C. was without proper care necessary for his well-being. The affidavit in support of the petition cited pending drug charges against father, the parents' tumultuous relationship, mother's suspected impairment on several occasions, her missed visits and meetings with service providers, and the events of May 6, including the aggravated domestic assault charge mother faced.

¶ 8. On May 19, 2017, two days after the second petition was filed, the family division held a temporary care hearing concerning the initial CHINS petition. Following the hearing, the court denied the initial petition on the ground that the State had not proved that at the time the petition was filed B.C. was at substantial risk of physical or emotional harm. That same day, however, the court also issued an order maintaining B.C. in the temporary custody of DCF, with supervised parental visitation, in response to the State's newly filed CHINS petition.

¶ 9. At a September 2017 temporary care hearing, after learning that mother had been admitted to the Lund Center and was progressing well there with B.C., the family division issued a conditional custody order (CCO) placing B.C. in mother's custody while she remained at the Center, pending a disposition order. On December 7, 2017, the State amended its May 17 petition by changing the date of when B.C. was alleged to be CHINS from May 17 to May 19—the day that the family division denied the initial CHINS petition.

¶ 10. Following a December 11, 2017, merits hearing on the second CHINS petition, on January 30, 2018 the court granted the petition and adjudicated B.C. CHINS. The court concluded that B.C. was CHINS at the time the second petition was filed because mother had relapsed on benzodiazepines, her ability to effectively engage with DCF and B.C. was impaired in the months preceding the petition, she missed several scheduled appointments and visits, and she had been involved in an altercation with father in close temporal proximity to a visit with B.C. at the location of the visit. The court also assigned some probative value to evidence that mother repeatedly

4

exposed at least one of her older daughters to the presence of an abusive and volatile former partner, as reflected in findings in a prior CHINS decision involving mother's older daughters that was admitted into evidence in the merits hearing in this case. The court acknowledged mother's recent progress at Lund, but noted mother's history of exposing her children to domestic violence and the challenges she would face in transitioning into the community from the structured environment of Lund. The court concluded that, in order to protect B.C.'s welfare and safety, the child's continued custody with mother would be "subject to the condition that she continue to adhere to the provisions of DCF's reunification plan."[3]

¶ 11.    Mother appeals the family division's CHINS determination, arguing that: (1) the court erred in admitting father's out-of-court statements as admissions by a party-opponent; (2) the court improperly relied on, as substantive evidence, findings set forth in the CHINS decision involving mother's older children; and (3) there was insufficient evidence that B.C. had been harmed or was at risk of harm at the time the State filed its second CHINS petition, especially given that B.C. had been in DCF custody for months.[4] We conclude that the family division erred in admitting father's out-of-court statements implicating her, and that, without those statements, the evidence, as found by the court, does not support the court's CHINS determination.

¶ 12.    The general law concerning CHINS petitions is settled. A child may be adjudicated CHINS if at the time the petition is filed he or she "is without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being." 33 V.S.A. § 5102(3)(B); see In re M.L., 2018 VT 32, ¶ 16, ___ Vt. ___, 186 A.3d 618 (stating that "in evaluating the State's

---

[3] At the time of the merits hearing, father's paternity had not been established by testing, but no party had disputed it. Father did not actively participate in the CHINS proceedings and, although he was represented by counsel in the merits hearing, he did not personally appear at the merits hearing. Nor has he appealed that order.

[4] On March 7, 2018, following its CHINS merits determination, the family division issued a disposition order assigning conditional custody to mother. Following a hearing on August 21, 2018, the court returned custody to mother without conditions and closed the case. We denied the juvenile's motion to dismiss mother's appeal as moot.

CHINS petition, we focus on the circumstances at the time the State filed the petition," but noting that "circumstances leading up to the filing of the CHINS petition may be relevant to the court's assessment"). "[T]he focus of a CHINS proceeding is the welfare of the child." In re B.R., 2014 VT 37, ¶ 13, 196 Vt. 304, 97 A.3d 867 (quotation omitted). "A child need not suffer actual harm before he or she can be adjudicated CHINS." In re M.O., 2015 VT 120, ¶ 6, 200 Vt. 384, 131 A.3d 738 (quotation omitted). The State must prove the lack of proper parental care by a preponderance of the evidence. Id. On appellate review, "[t]he court's findings will stand unless clearly erroneous, and its legal conclusions will stand if supported by the findings." Id. ¶ 7.

¶ 13. Applying these standards, we conclude that the family division improperly admitted evidence of father's out-of-court statements. We further conclude that the admissible evidence, as found by the court, is insufficient to support the CHINS determination.

I. Admission of Father's Out-Of-Court Statements

¶ 14. On appeal, mother argues that the family division erred in admitting, pursuant to Vermont Rule of Evidence 801(d)(2), father's statements accusing her of stabbing him. She argues that, as a noncustodial parent, father was not a party to the merits proceeding. The question of whether father's out-of-court statements are excluded from the definition of hearsay pursuant to Rule 801(d)(2) for the purposes of this merits hearing is a question of law that we review without deference to the trial court. State v. Amidon, 2008 VT 122, ¶ 16, 185 Vt 1, 967 A.2d 1126 (explaining that interpretation of procedural and evidentiary rules is question of law that we review without deference).

¶ 15. Vermont Rule of Evidence 801(d)(2) excludes from the definition of hearsay, among others, a statement that is "offered against a party and is . . . [the party's] own statement." The exclusion encompasses any statements made by and offered against a party opponent, and need not have been against the declarant's interest when made. State v. Bernier, 157 Vt. 265, 268, 597 A.2d 789, 791 (1991).

6

¶ 16. The family division's ruling that father's statements were admissible in this case rests on two distinct legal conclusions, both challenged on appeal. First, the statements are admissible against father because he is a party to this CHINS case and the statements were contrary to his interests in the proceedings. Second, assuming the statements were admissible against father, it was proper to consider them in this CHINS merits proceeding regardless of whether they were independently admissible "against mother."[5] We do not address the second of these implicit conclusions because we conclude on this record that the statements were not properly offered against father in the CHINS proceeding. We draw support for this conclusion from our recent consideration of a similar case as well as the purposes of the hearsay rule and the exclusion in 801(d)(2). Further, we conclude that the family division's error on this point is not harmless.

¶ 17. Our discussion of a similar issue in this Court's recent decision in In re L.M., supports our conclusion that the out-of-court statements were not offered against father in this CHINS proceeding. 2014 VT 17, 195 Vt. 637, 93 A.3d 553. In L.M., we concluded that the family division had improperly admitted evidence of the mother's out-of-court statements in a CHINS merits hearing in which the father was also a party after the mother stipulated to the merits. We concluded that the mother's statements were not being offered against her because she had admitted that the child was CHINS by stipulating to a merits determination. Id. ¶ 16. We further emphasized that there was no basis for allowing the mother's statements to be used against the

---

[5] Compare In re Care & Prot. of Sophie 865 N.E.2d 789, 796 (Mass. 2007) (rejecting argument that because statements were admissible against at least one party they should be admitted in child-protection proceeding, and explaining that inadmissibility against one party trumped admissibility of evidence against other, thereby requiring exclusion), and Cochran v. Ark. Dep't of Human Servs., 860 S.W.2d 748, 750 (Ark. Ct. App. 1993) (declining to allow out-of-court statements by one party in child welfare proceeding because father had never made, acquiesced in or adopted statements, and explaining that "[w]here . . . the interests of coparties are all dependent on the existence of a particular fact, the admission of one of them with respect to such fact cannot be received, because it could have no effect as to [that party] without affecting the others" (quotation omitted)), with In re J.M. & J.M., 804 S.E.2d 830, 834 (N.C. Ct. App. 2017) (concluding that because issue in child protection case concerns conditions surrounding child, and not culpability of any particular parent, trial court could rely on evidence that is admissible against either parent).

father.  Id.  In ascribing significance to the mother's stipulation, we looked beyond the mother's status as a party to the CHINS proceeding (she clearly was), and considered whether in any real sense the proffered evidence was offered "against" her.

¶ 18.    This focus makes sense, given that the purposes of the hearsay prohibition and the 801(d)(2) exclusion support exclusion of the evidence.  Citing the Reporter's Notes to V.R.E. 801, we acknowledged in L.M. that the 801(d)(2) exclusion arises from the nature of the adversary system.  2014 VT 17, ¶ 17.  In particular, the hearsay rule is designed to preclude admission of out-of-court statements that cannot be cross-examined by the party against whom they are offered; however, when the out-of-court statements were made by the party against whom they are offered, that party cannot cross-examine itself.  Id.  We acknowledged that that party is free to take the stand to explain the statement, but concluded that the hearsay rule, designed to ensure that parties can test all the testimonies against them through cross-examination, is not relevant when the testimony is the party's own.  Id. (citing In re V.N.W., 292 P.3d 548, 554 (Or. 2012) (en banc)).  Thus, in L.M., where mother had no further interest in the CHINS proceeding, even though she remained a party and could have asserted her interests, it would have been a fiction to say that the statements were offered "against" her.

¶ 19.    In this case, assuming that father was a party to the CHINS proceeding, because he was a noncustodial parent and did not assert any interests at the CHINS stage, he, like the mother in L.M., had no interest in the CHINS proceeding such that the statements were admissible against him.  As noted above, by the time of this CHINS petition, father was noncustodial.  His nonparticipation did not defeat an effective CHINS adjudication.  See In re M.S., 2017 VT 80, ¶ 32, __ Vt. __, 176 A.3d 1124 (explaining that family division had properly concluded that child was without proper supervision in custody of his mother, and that noncustodial father's absence from the merits hearing did not undermine CHINS determination).  Nor did father assert any interests relative to the CHINS determination.  His lawyer participated in the merits hearing, but

offered no witnesses, made no argument, and took no position as to the merits determination. Where father asserted no interests in the CHINS merits proceeding, we cannot conclude that the out-of-court statements were properly offered "against" father.

¶ 20. Nor can we say that the family division's admission of the hearsay evidence was harmless. Although the court did not make a finding that mother stabbed father, its merits determination rested in substantial part on its conclusion that an "altercation" occurred between mother and father in close temporal proximity to the child's visit, representing a failure of mother to address concerns about domestic violence. But based on the family division's findings, the only thing that happened the morning of the visit was that father was in mother's home when the visit supervisor showed up to pick up mother, and he left as she was returning with the child.

¶ 21. Significantly, the family division did not find that father continued to live with mother despite mother's claims to the contrary. Rather, the court apparently credited mother's testimony that father occasionally stopped by to get his mail and pick up clothes, and that the night before the altercation mother had made repeated efforts to remove father from her home after he stopped by, including calling the police twice and trying to file a relief-from-abuse petition. Instead, the family division's conclusion that mother had failed to address concerns about domestic violence was based on an altercation between mother and father shortly before mother's visit with B.C.

¶ 22. The only altercation between mother and father identified in the court's findings occurred the night before, when mother repeatedly sought the intervention of police, and was frustrated in her attempt to seek a court order requiring father to stay away from the home. The family division's finding that an altercation occurred between mother and father in close temporal proximity to mother's visit with the child was necessarily based in part on father's out-of-court statements accusing mother of inflicting the stab wounds he had an hour-and-a-half after leaving mother's home. And the finding that mother and father had an altercation in close temporal

9

proximity to mother's visit with B.C. was the basis for the family division's conclusion that mother had failed to appropriately address concerns about domestic violence. Without father's improperly admitted out-of-court statements, the court's finding that mother had failed to appropriately address concerns about domestic violence cannot stand. This finding was critical to the court's CHINS determination.

## II. Sufficiency of the Evidence

¶ 23. We reverse rather than remand because we conclude that without this evidence, the remaining evidence, as found by the family division, would be insufficient to support a CHINS determination. Although the court's CHINS determination rested in large part on its findings regarding mother's failure to address domestic violence concerns, the court also made several other findings in support of its decision. First, mother had recently missed several visits and scheduled appointments, including substance abuse counseling, and had relapsed on benzodiazepines on one occasion shortly before the petition was filed. Second, in the months preceding the State's filing of its petition, mother exhibited signs of impairment during several meetings with DCF and one visit with B.C. The court concluded that, regardless of whether mother was actually impaired as a result of illicit drug use, as DCF personnel suspected, their testimony as to mother's mental state was probative of mother's ability to effectively engage with both DCF and B.C. at those times and to adequately supervise B.C. And finally, the court concluded that the merits findings from an earlier CHINS proceeding concerning mother's two older daughters had "some probative value" to show that mother had "repeatedly exposed at least one of her children to the presence of an abusive and volatile former partner." These findings, and the evidence underlying them, cannot support a CHINS determination. We consider each in turn, bearing in mind the applicable standards at the merits hearing.

¶ 24. "[A]ny time the State seeks to interfere with the rights of parents on the generalized assumption that the children are in need of care and supervision, it must first produce sufficient

evidence to demonstrate that the statutory directives allowing such intervention are fully satisfied." In re N.H., 135 Vt. 230, 235, 373 A.2d 851, 855 (1977).

¶ 25. Mother's admitted single use of benzodiazepines on May 5, 2017, while B.C. was in DCF custody and being cared for by others, is minimally probative of the child's status as CHINS two weeks later. Any connection between mother's use of illegal drugs on that occasion and a risk to the child is remote. Although the family division implied that mother's relapse may have been more enduring—it noted that she had missed substance abuse counseling appointments—it did not find that mother was actively using on an ongoing basis at the time the CHINS petition was filed. In fact, as noted below, it expressly declined to do so.

¶ 26. Although the family division cited the testimony of the DCF caseworker and family time coach that mother appeared at some meetings and a visit in the spring of 2017 showing signs of impairment, the court did not determine whether mother was in fact impaired by substances on those occasions. In particular, the DCF caseworker testified that at a shared parenting meeting in April 2017 mother told her that she had taken too much of her prescribed medication, causing mother to have delayed responses and to forget things. The family time coach testified that although mother was generally very attentive during visits with B.C., on one occasion she was "definitely off" during a visit, resulting in her not being "as attuned as she has been" in dealing with B.C.'s fussiness. The family division concluded that, "regardless of whether mother was, in fact, under the influence" on the occasions in question, the testimony concerning her behavior was "probative of mother's inability to effectively engage with both DCF and [B.C.] at these times." Absent any finding that mother was impaired on these occasions, the testimony concerning these incidents does not support the court's CHINS adjudication. A parent's being "off" on one occasion, and slow and forgetful on another, are not, without significantly more, grounds to support a CHINS determination.

11

¶ 27. Finally, even assuming the family division permissibly relied upon findings from a prior CHINS decision concerning mother's failure to protect one of her daughters from being exposed to domestic abuse, those findings are insufficient to support this CHINS petition in the absence of evidence supporting the inference that mother was continuing to expose her child to such risks.[6] The court's findings, or lack thereof, on these points fail to demonstrate by a preponderance of the evidence that B.C. was CHINS at the time DCF filed its second petition. See 33 V.S.A. § 5101(a)(3) (identifying one purpose of juvenile judicial proceedings as "separat[ing] a child from his or her parents only when necessary to protect the child from serious harm").[7] Accordingly, we reverse.

The superior court's January 30, 2018 decision adjudicating B.C. to be a child in need of care or supervision is reversed.

FOR THE COURT:

_____
Associate Justice

---

[6] Because we conclude that, even considering the challenged findings, the State's evidence is insufficient to support a CHINS determination, we do not address mother's argument that the family division improperly relied on the findings.

[7] Because we conclude that the evidence was insufficient to support a CHINS determination in the absence of the improperly admitted evidence, we do not address mother's additional arguments that because B.C. was in DCF custody during the months leading up to the second CHINS petition, including the date the petition was initially filed, he could not have been in need of care or supervision.