NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 90

No. 2019-285

| | |
|---|---|
| In re M.E., Juvenile | Supreme Court |
| | On Appeal from<br>Superior Court, Windsor Unit,<br>Family Division |
| | November Term, 2019 |

Elizabeth D. Mann, J.

Matthew Valerio, Defender General, and Rebecca Turner, Appellate Defender, Montpelier, for Appellant Juvenile.

David Tartter, Deputy State's Attorney, Montpelier, for Appellant State.

Michael Rose, St. Albans, for Appellee Mother, and Allison N. Fulcher, Barre, for Appellee Father.

PRESENT: Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Grearson, Supr. J., Specially Assigned

¶ 1. **CARROLL, J.** Juvenile M.E. appeals the family division's dismissal of the State's petition to declare her a child in need of care or supervision (CHINS). The State joins in the appeal. We affirm.

¶ 2. In May 2019, the Department for Children and Families (DCF) filed a petition alleging that M.E. was without proper parental care as provided in 33 V.S.A. § 5102(3)(B). The CHINS petition was based on mother's admitted use of heroin on one occasion and allegations that M.E. had been exposed to drug use and paraphernalia while in the care of her parents. The court issued an emergency care order transferring custody to DCF. After a temporary care hearing,

custody was continued with DCF.  A merits hearing was held on August 7, 2019.  In a written order issued on August 12, the court concluded that the State had failed to establish the merits and dismissed the petition.

¶ 3.     The court made the following findings in its order.  At the time the CHINS petition was filed, M.E. was almost five years old.  She lived with mother and father in an upstairs bedroom of the home of father's grandmother.  Father worked long hours and mother stayed home with M.E.  In early 2019, mother began working approximately twenty hours per week, during which time M.E. was cared for by father's mother or grandmother.

¶ 4.     In May 2019, family members filed reports with DCF expressing concern that mother, father, and M.E. did not spend much time with the family, appearing only for meals.  They observed that both parents seemed to have lost weight, had swollen hands, and seemed less involved with M.E.  M.E. appeared dirty and unbathed.  Her hair was snarled and she wore the same clothes for two to three days at a time.  Mother and father have had addiction issues in the past.

¶ 5.     On May 21, 2019, a DCF case worker visited the home.  When he arrived, mother and M.E. were stepping outside to play.  He observed that mother's pupils were small and she seemed shaky.  He acknowledged that the sun was shining at the time.  He did not observe M.E. to be dirty, unbathed, or unkempt.

¶ 6.     Mother told the case worker that she had used heroin once within the past week to address tooth pain.  She agreed to sign up for substance-abuse case management.  The case worker also spoke to M.E., who stated that there were "little baggies with white stuff in them in the bedroom."  During this conversation, mother went into the house "to take care of something."

¶ 7.     When mother returned, the case worker asked to see the bedroom where M.E. lived with mother and father.  The room was dark and filled with mattress-height clutter that blocked access to the windows.  On the desk in the room, accessible to M.E., were vape cartridges

2

containing a small amount of oil. There was also a dusty shelf with a square void. M.E. reported the space was where "Daddy's box," in which he kept the baggies with white stuff, had been earlier in the day. Mother said the space was where father kept a box containing his work knives. Father is a cook in a restaurant.

¶ 8. Mother agreed to a safety plan under which M.E. would stay with cousins and mother would stay with a friend. The case worker testified that this plan was created because mother said she was afraid of repercussions from father when he heard about DCF's visit. At the hearing, mother denied that she was ever afraid of father. She returned to stay with father on the following Friday. The same day, she reengaged in substance-abuse treatment with her provider at Connecticut Valley Recovery Center. DCF decided to seek an emergency-care order after it learned that mother had returned to the home.

¶ 9. The court found that father had "displayed some physically aggressive behaviors" after his grandfather died when father was in his early twenties. The court found that father was now thirty-eight years old and there was no evidence that he had continued to be physically aggressive. Father voluntarily completed an anger-management program after undergoing intensive outpatient treatment several years ago while he was under supervision of the Department of Corrections. The DCF case worker stated that when he was able to speak with father about M.E., father was "standoffish" and terminated the conversation before a safety plan could be discussed. The court found this account to be credible. However, it noted that the case worker did not describe father as being loud, aggressive, or threatening. Father testified that he was now sober except that he smoked approximately three marijuana joints per day.

¶ 10. The court found that mother and father had been attentive to M.E. and had taken her to the doctor for required medical attention. Mother would engage in play and craft projects with M.E. and read to her. The court expressed concern that M.E. did not yet know the alphabet or numbers and could not spell her name even though she was five years old. It noted that there

3

was conflicting evidence regarding M.E.'s cleanliness and appearance. M.E. had a yeast infection when she was taken into custody and there were concerns about her continued use of a potty chair in the bedroom she shared with her parents. The court noted that there was only one bathroom in the house and mother emptied the potty chair frequently.

¶ 11. The court also was concerned that father was essentially under the influence of marijuana for most of the day. However, it found that father was not M.E.'s primary care provider and only interacted with her when mother was present. The court stated that it was "of great concern" that mother chose to use heroin to address tooth pain, but found no other evidence of drug use by mother and found it significant that she engaged in substance-abuse treatment before the CHINS petition was filed. The court concluded that the State had not established that M.E. was CHINS by a preponderance of the evidence and dismissed the petition. This appeal followed.

¶ 12. As relevant here, a child is CHINS if the child "is without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being." 33 V.S.A. § 5102(3)(B). The State has the burden of proving that a child is CHINS by a preponderance of the evidence. Id. § 5313(a). In reviewing the family division's decision dismissing the CHINS petition, we will uphold the court's findings of fact unless they are clearly erroneous and will affirm its legal conclusions if supported by the findings. In re M.L., 2010 VT 5, ¶ 8, 187 Vt. 291, 993 A.2d 400. "We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993).

¶ 13. On appeal, M.E. claims the court erred in finding that there was no evidence of other recent drug use by mother besides the single instance of heroin use for tooth pain. She argues that the DCF case worker testified that M.E. reported having seen mother and father smoke the white stuff in the baggies with fire, and there was circumstantial evidence of recent drug use by mother in the form of statements by M.E., family members' observations of mother's physical

4

appearance, and mother's testimony that she quit working at the restaurant where father was employed because there was drug use in the workplace. M.E. argues that the court abused its discretion by ignoring relevant undisputed evidence that parents were using drugs while she was in their care, which placed her at risk of harm.

¶ 14. The family division's findings were not clearly erroneous. First, M.E.'s out-of-court statements to the case worker about the baggies and what parents allegedly did with them were hearsay. Because no party objected to the admission of the statements, the court was not prohibited from considering them. See In re M.P., 133 Vt. 144, 146, 333 A.2d 116, 118 (1975) (explaining that hearsay is inadmissible at merits stage of CHINS proceeding because parties have right to cross-examine witnesses against them, but "even uncorroborated hearsay evidence may support a factual finding if admitted without objection"). However, as factfinder the court also had discretion to give the statements minimal weight.[1] In re A.F., 160 Vt. at 178, 624 A.2d at 869; see also City of Montpelier v. Town of Calais, 114 Vt. 5, 11, 39 A.2d 350, 354 (1944) (explaining that although finding can be based on hearsay evidence admitted without objection, weight to be given such evidence is for trier of fact to decide).

¶ 15. Even if it did not consist of hearsay, the DCF case worker's testimony was not as clear-cut as M.E. claims on appeal. He testified that M.E. "described that her Mommy and Daddy smoke something. I couldn't really gather—I couldn't really clarify what they were smoking." After refreshing his recollection by looking at his report, he stated that M.E. said "They smoke it with fire." He agreed on cross-examination that M.E. could be referring to tobacco. Later, when asked by M.E.'s attorney whether M.E. had stated that the bags were small and contained white stuff and that father smoked them with fire, he said yes. The latter testimony conflicted with the

---

[1] Likewise, M.E.'s alleged statements to father's grandmother that "Daddy takes his blood out and puts it back in again," and that she was told to stay in the car while her parents went into a motel, as well as her alleged statement to father's older son that she had seen her father's "needles," were hearsay that the court was free to disregard as not credible or to assign little weight.

case worker's affidavit, in which he stated that M.E. reported the bags were small and white and it was unclear what father and mother smoked. Notably, at no point in his testimony did the case worker indicate when this alleged drug use occurred. The testimony was vague and inconclusive and the court was free not to give it any weight. See In re M.C.P., 153 Vt. 275, 298, 571 A.2d 627, 639 (1989) (explaining family court views witnesses and may choose which testimony to believe).

¶ 16. Likewise, the court did not abuse its discretion by failing to conclude based on circumstantial evidence that mother and father were using heroin or other drugs while M.E. was in their care. The following evidence was cited by M.E. as proof of parents' drug use. Father's cousin, a registered nurse who fostered M.E. after she was taken into DCF custody, testified that during a family gathering in April, she noticed that mother had swollen hands, which can be a sign of opiate use. She said that mother and father were disoriented and were nodding off during conversation. She also stated that father and mother had lost weight and seemed "checked out" and that both parents wore long sleeves regardless of the weather.[2] However, she admitted that she had only seen mother on one occasion recently and had very limited interactions with father. The cousin testified that after M.E. was removed from parents' care, she went into the family's room and observed "drug paraphernalia" including "pipes and bowls" and a bowl filled with white baggies. She did not investigate what was in the bags.

¶ 17. In addition, the DCF case worker observed that mother's pupils were small and she seemed shaky. The case worker noticed vape cartridges containing "a very small amount of oil" in the family's room. The case worker stated that mother said the cartridges contained THC but

---

[2] Contrary to M.E.'s assertions in her brief, the court's recitation of family member's testimony is not a finding of the facts contained in that testimony, and we do not construe it that way. See Krupp v. Krupp, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967) ("A recitation of evidence in findings is not a finding of the facts contained in the testimony related and it cannot be so construed.").

had not been used since before M.E. was born. Mother testified that she quit working at the restaurant where father worked because there was drug use in the work environment. At the hearing, father had some red marks on the inside of his elbow. Finally, father's grandmother stated that in recent months, mother had been "[p]robably more reclusive than before."

¶ 18. M.E. argues that the court should have concluded based on the above evidence that mother and father were actively using drugs at the time of the CHINS petition, thereby placing her at risk of harm. While the court, as finder of fact, may draw rational inferences from circumstantial evidence, the evidence and inferences "must add up to more than mere suspicion." State v. Durenleau, 163 Vt. 8, 12, 652 A.2d 981, 983 (1994). The court was not required to draw the inference of recent drug use by parent that M.E. seeks.

¶ 19. Furthermore, mother and father disputed much of the above testimony. Mother implied that she and M.E. avoided family gatherings because father's relatives drank excessively and would become loud, making her and M.E. anxious. In addition, father's relatives would bring up father's past in front of M.E., which mother found to be inappropriate. Mother denied using drugs on the day the DCF case worker visited the home or the day before. She testified that the vape cartridges in the room contained nicotine and only had a tiny amount of oil in them. Mother admitted that she had used heroin one time a week before the case worker's visit to treat severe tooth pain. However, she testified that she had not used again and that she was seeing a dentist for treatment. She was also actively engaged in substance-abuse therapy. She had successfully completed Suboxone treatment four years previously with the same provider. Father testified that other than using marijuana, he had been sober since 2008 and had not used opiates or alcohol. When asked to explain the red marks on his arms, father stated that the marks were oil splashes from cooking. The family court acted within its discretion as factfinder in weighing the conflicting testimony and finding mother and father to be credible regarding their recent history with drugs.

7

See In re A.F., 160 Vt. at 178, 624 A.2d at 869 (explaining that matters of credibility and weight afforded to evidence are within sound discretion of family court).

¶ 20. M.E. argues, however, that parents did not dispute testimony by father's family members regarding parents' alleged weight loss, swollen hands, apparent drowsiness, long-sleeved shirts, and reclusiveness, and that this testimony clearly established parents' drug use.[3] As we have stated in other contexts, "a court or jury is not bound in all circumstances to believe testimony not directly contradicted." Gramatan Nat'l Bank & Tr. Co. of Bronxville v. Beecher, 121 Vt. 39, 47, 146 A.2d 246, 251 (1958). Most of these observations were made by father's cousin, who admitted that she had only seen mother once recently and had rare, brief interactions with father. And although the cited behaviors can be associated with drug use, there are many other reasonable explanations for a parent to lose weight, be sleepy, have swollen hands, wear warm clothing, or want to avoid his or her relatives. The court, as the finder of fact, was not required to draw an inference against parents based on this circumstantial evidence. Fairbanks v. Frank, 107 Vt. 45, 49, 176 A. 294, 296 (1935) (explaining that trial court may draw inferences of fact if reasonably warranted from evidence); see also In re B.C., 2018 VT 126, ¶ 26, __ Vt. __, 203 A.3d 515 ("A parent's being 'off' on one occasion, and slow and forgetful on another, are not, without significantly more, grounds to support a CHINS determination."). That being said, we agree with the dissent that it would have been helpful in this case for the trial court to explain why it rejected the above evidence. The trial court is not required to make a finding regarding every item of evidence presented at trial, but it should make findings on all material issues raised by the evidence.

---

[3] The court noted this testimony but neither credited nor rejected it. "A recitation of evidence in findings is not a finding of the facts contained in the testimony related and it cannot be so construed." Krupp, 126 Vt. at 514, 236 A.2d at 655. We have repeatedly disapproved of so-called "Krupp findings," which are inadequate to form the basis for a decision. In re M.G., 2010 VT 101, ¶ 14, 189 Vt. 72, 13 A.3d 1084. Although in this case there is adequate evidence to support the court's decision as a whole, we wish to emphasize that when the court is sitting as a finder of fact, it should determine the facts rather than merely recite the testimony offered by the parties. The findings the trial court did make were minimally sufficient to support its conclusion.

Guibord v. Scholtz, 2006 VT 22, ¶ 8, 179 Vt. 623, 895 A.2d 202 (mem.). Because the above testimony was relevant to the State's allegations of drug use by parents, the better practice would have been to address it.

¶ 21. "[A]ny time the State seeks to interfere with the rights of parents on the generalized assumption that the children are in need of care and supervision, it must first produce sufficient evidence to demonstrate that the statutory directives allowing such intervention are fully satisfied." In re N.H., 135 Vt. 230, 235, 373 A.2d 851, 855 (1977). The court concluded that the State failed to meet its burden in this case, and we cannot say this conclusion was an abuse of discretion. The single instance of heroin use by mother a week prior to the DCF case worker's visit was minimally probative of M.E.'s status as CHINS at the time the petition was filed. In re B.C., 2016 VT 126, ¶ 25. There was no evidence that the heroin use occurred while M.E. was present. The court noted that mother had immediately reentered substance-abuse therapy, and found no other evidence of a relapse. The court also found that father's marijuana use did not endanger M.E. because he was not her primary caregiver and was out of her presence most of the day. The court found that parents were generally attentive and cared appropriately for M.E. Although it found that there were areas of daily living that could be improved for the child, it ultimately was not persuaded that she was at risk of harm in her parents' care.

¶ 22. The fact that there was evidence in the record to contradict the court's findings is insufficient for us to reverse its conclusion. In re I.G., 2016 VT 95, ¶ 17, 203 Vt. 61, 153 A.3d 532. Our role as an appellate court is not to second-guess the family court or to make our own assessment of the evidence, but rather to determine whether the court abused its discretion in dismissing the CHINS petition. In re S.B., 174 Vt. 427, 429, 800 A.2d 476, 479 (2002) (mem.). "[I]t is the exclusive role of the family court to weigh the evidence and assess the credibility of witnesses." In re M.L., 2010 VT 5, ¶ 29. The family court's findings are supported by evidence in the record and we therefore will not disturb its decision. See id. (affirming dismissal of CHINS

petition where case turned on family court's assessment of weight of evidence); Bull v. Pinkham Eng'g Assocs. Inc., 170 Vt. 450, 454, 752 A.2d 26, 30 (2000) ("Findings are viewed in the light most favorable to the judgment, disregarding modifying evidence, and will not be disturbed merely because they are contradicted by substantial evidence; rather, an appellant must show that there is no credible evidence to support them."). It is not enough that we might have come to a different conclusion than the trial court had we heard the evidence in the first instance.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 23. **REIBER, C.J, dissenting.** This is a rare case. Unusually, the child who is the subject of the petition to declare her a child in need of care or supervision (CHINS) contests the family court's dismissal and seeks protection. The record includes out-of-court statements by that child that strongly indicated that mother and father were abusing drugs. The record also includes significant testimony by family members and a case worker with the Department for Children and Families (DCF) that indicated parents had relapsed. But the family court engaged in no analysis of this substantial evidence intended to support the State's case that M.E. was CHINS. It merely recited some of the testimony, without making credibility assessments, weighing the evidence, or making findings regarding that testimony. Our standard of review in CHINS cases is very deferential, but in this case, deference is not warranted. I cannot hold that the family court's decision is supported by the findings in this case, and I would reverse and remand. Accordingly, I respectfully dissent.

¶ 24. The State presented substantial evidence that father and mother were engaging in drug abuse at the time the CHINS petition was filed. Father's grandmother and cousins, one of

whom is a registered nurse, testified that father and mother—both of whom have experienced drug addiction in the past—became more "secluded" and "secretive" in the spring of 2019, and they had "swollen, red hands" and had experienced "weight loss." The nurse explained, "[T]hat's something we're trained as emergency room nurses to look at is the swollen extremities, possible red marks, puncture sites." The nurse further testified that father always wore long sleeves and did not make eye contact, which was "very common for when he's been using in the past" but "a change from when he is not using." At the same time that the family members observed signs of relapse, they noticed that M.E. mixed with the family less, seemed to spend nearly all her time in the room that she shared with her parents, and appeared dirty and unbathed, with matted hair. They also reported that the room M.E. shared with her parents was excessively messy and dirty. The nurse testified that after parents left, she observed in their room "drug paraphernalia," "pipes and bowls," and "a bowl with another plastic bowl inside filled with little baggies." She believed the room was unchanged from when parents were living there.

¶ 25. Additionally, father's grandmother testified that M.E. had told her "that Daddy takes his blood out and puts it back in again," which made grandmother concerned that father was abusing drugs. Grandmother further stated that M.E. had told her "she would stay in the car while Daddy and Mommy went into the motel, and she stayed in the car and played with her tablet," which worried grandmother "[b]ecause these particular motels are notorious for drugs."

¶ 26. The testimony by the DCF case worker corroborated the family's testimony regarding a relapse. He testified as follows. When he visited mother and father's home, he noticed that mother's pupils were "kind of pinned out and small," which is "a sign of opiate use," and she was "physically shaky." In talking with M.E., he "learned that there was something to do with baggies that had white stuff in them and that they were up in the bedroom." The DCF case worker asked what father did with the bags, and M.E. said that "he smokes with them with fire." She also

11

said, "Daddy told her not to tell" and that "when her daddy gets mad, he throws the bags on the desk."

¶ 27.   Mother heard this conversation with M.E. about the baggies and immediately went into the house alone, saying she needed "to go check on something," and "she also mentioned something that, if [father's] really doing this, I'm going to have to do something about it, or leave, or something of that nature."  The DCF case worker asked to accompany her into the house, which she refused.  Mother returned shortly, and she then allowed the DCF case worker to enter the house and see their room.  The DCF case worker noticed the room was "very dark," it had "clutter that was up to the height of the mattresses on the floor," and "[t]here was a kind of path to the bed."  He observed vape cartridges on a desk and asked mother about them.  She said they were THC-based but that she and father had not used them since before M.E. was born.

¶ 28.   While they were in the room, M.E. "pointed at a spot in the shelf that had . . . an outline of a square" with "dust all around it" and "ask[ed] where Daddy's box was."  M.E. "indicated that's where Daddy kept the baggies with the white stuff in them."  Mother "said she didn't know what [M.E.] was talking about, but [M.E.] said, well, that box was there today."  Mother replied, "well, [father] usually brings that box with him to work every day."  Almost immediately after this conversation, mother "said that she wasn't feeling well, a little bit sick to her stomach, and she asked that we go outside."

¶ 29.   As a result of these conversations and the DCF case worker's observations about mother's physical demeanor, he arranged a safety plan for M.E. with mother, according to which M.E. temporarily left grandmother's home to stay with father's cousin and mother left to stay with a friend.  The next day, the DCF case worker visited father at his work to discuss the allegations and the safety plan.  During their conversation, father said, "I do a little dope to get through the [expletive] day" and then, when questioned, said that "dope was marijuana."  The DCF case worker noticed that father "had pick marks on his face, which, in my training experience, is also a sign of

12

substance abuse." Father's hat was positioned so that the DCF case worker could not see his eyes. Father wore "a long-sleeve shirt on a pretty warm day." At court, it was shown that father had "two red marks on the inside of his elbow" on one arm, right above his vein.

¶ 30. The family court either ignored this substantial testimony or recited it without analysis. This was error. "When judges act as triers of the facts, they are bound to impartially and judicially weigh and sift the evidence, in order to find and state the facts relevant to the controversy established by the evidence." Mandigo v. Mandigo, 128 Vt. 446, 450, 266 A.2d 434, 436-37 (1970). "[A] mere recitation of testimony" is not sufficient. In re E.C., 2010 VT 50, ¶ 14, 188 Vt. 546, 1 A.3d 1007 (mem.) (citing Krupp v. Krupp, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967)). On the contrary, such a recitation—called a "Krupp finding"—"is not the equivalent of a finding of the facts contained in that testimony" and "cannot form the basis for a decision." Id.; see also Krupp, 126 Vt. at 513, 236 A.2d at 654-55 ("It is the duty of the court, in making findings, to sift the evidence and state the facts. This means that the court considers all the evidence bearing on the issues with impartial patience and adequate reflection and then formulates the findings couched in its own language." (citation omitted)).

¶ 31. If the court fails to properly examine the evidence and adopt findings of fact, the usual deference this Court affords the family court in a CHINS decision does not apply because there is no evidentiary assessment to which we can defer. See Kanaan v. Kanaan, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995) (explaining this Court "will not disturb a trial court's findings of fact unless they are clearly erroneous" because "it is in a unique position to assess the credibility of the witnesses and the weight of the evidence supported"); see also In re M.L., 2010 VT 5, ¶ 8, 187 Vt. 291, 993 A.2d 400 (explaining standard of review for CHINS decisions).

¶ 32. Here the family court addressed the family members' testimony suggesting relapse by stating: "Family members testified that they were concerned . . . that Mother, Father and [M.E.] did not spend much time with the family"; they "noted that Mother and Father . . . seemed to have

lost weight, had swollen hands and 'seemed less involved' with [M.E.]"; and they "indicated that [M.E.] appeared dirty and unbathed." The court disposed of the DCF case worker's testimony by reciting that he "noted that Mother's pupils were small and Mother seemed shaky." The court similarly recounted the discussion about the box in the bedroom by saying "[M.E.] reported the void was where 'Daddy's box' where he keeps the baggies with white stuff was earlier in the day" and "Mother reported the void was where Father keeps the box that holds his knives which he brings to work with him." The court ignored the testimony about M.E.'s statements regarding smoking with fire, how father took his blood out and put it back, and how her parents left her in the car while they went into a motel known for drug activity.[4] The court also ignored the DCF case worker's testimony about father's pick marks and the marks on his arms, as well as his testimony that father admitted to "do[ing] a little dope" every day. It is not clear from this recitation of evidence whether the court credited this testimony or was relying on it to make its decision.

¶ 33.    Certainly, the trial court was not required to credit this evidence, and there was contradictory testimony on which the court was entitled to rely. In re B.G., 2016 VT 107, ¶ 9, 203 Vt. 317, 155 A.3d 179 (holding family court "was within its discretion in failing to credit mother's testimony"); Potwin v. Tucker, 126 Vt. 414, 418, 234 A.2d 430, 433 (1967) (holding trial court "has the exclusive right to resolve conflicting testimony"). Nor is the court required to examine each piece of evidence in its written opinion. But given the direct connection between this testimony and the drug-abuse claims made in the CHINS petition, the court should have addressed whether it found this testimony credible and clearly made findings based on its analysis. Cf.

_____

[4] Although M.E.'s statements are hearsay and generally inadmissible at the merits hearing, In re R.M., 150 Vt. 59, 65, 549 A.2d 1050, 1054 (1988), the admissions were not challenged. Therefore, they are part of the evidence in the record and should be considered in the same way as the other evidence. Cf. LaMoria v. LaMoria, 171 Vt. 559, 562, 762 A.2d 1233, 1236 (2000) (mem.) (holding that defendant's argument on appeal that hearsay testimony should have been excluded was waived because she failed to object to testimony in trial court).

14

Mandigo, 128 Vt. at 450, 266 A.2d at 436-37 ("Some evidence, because it is not only critically relevant, but also is uncontroverted and of undeniable credibility, requires recognition in findings as a matter of law.").

¶ 34.    The majority assumes that the court did not find this evidence credible, and instead credited parents' conflicting testimony. See ante, ¶ 19. But there are no findings establishing that the court was persuaded that mother's and father's drug use was limited in the way that mother and father testified. Instead, the court stated that mother "acknowledged to [the DCF case worker] that she had used heroin in the prior week to address tooth pain" and then concluded that this was "of great concern" but there was "no evidence of other drug use by Mother."[5] Regarding father, the court stated that father "testified that he has been sober since 2008 except that he smokes approximately three marijuana joints per day" and then concluded "[i]t is of great concern that Father engages in more than 'recreational' use of marijuana and is essentially under the influence most, if not all, of the day" but "Father's interactions with [M.E.] are limited." The court's recitations of mother's and father's statements are Krupp findings, which cannot be relied on to support the court's decision. See In re E.C., 2010 VT 50, ¶ 14. Nor may we interpret these statements by the court as findings. "A recitation of evidence in the findings is not a finding of the facts contained in the testimony related and it cannot be so construed." Krupp, 126 Vt. at 514, 236 A.2d at 655; see also In re B.C., 2018 VT 126, ¶ 6 n.2, __ Vt. __, 203 A.3d 515 (declining to recite certain testimony as fact because "the court neither credited nor rejected this testimony" and quoting Krupp, 126 Vt. at 514, 236 A.2d at 655). Without findings—as opposed to a mere

---

[5]  Possibly we could consider the court's statement that there was "no evidence of other drug use by Mother" as a finding of fact, rather than a conclusion. But the statement is made as part of the court's overall conclusions, which indicates that it was not a factual finding. Even if it was a finding of fact, the court's failure to examine the substantial evidence of drug abuse and its failure to make clear findings regarding father's possible drug abuse compel the conclusion that the court's decision was unsupported by the findings.

15

recitation of evidence—about parents' possible drug use, we cannot say that the court's conclusions are supported. See In re E.C., 2010 VT 50, ¶ 14.

¶ 35. Even if we were to construe the court's recitations of parents' statements as findings, it would not remedy the decision's shortcomings. If we construed parents' statements as factual findings, we would also have to construe the remaining recitations of testimony as factual findings—including, for example, that mother's pupils were dilated; both parents had red, swollen hands and had begun wearing long sleeves all the time; their behavior had become more reclusive and less attentive to their daughter; and that all of these facts can indicate a relapse in drug abuse. Once this other testimony is also adopted as findings, then, once again, the court's conclusions lack factual support.

¶ 36. We defer to a trial court's findings because the trial court is uniquely situated to assess and weigh the evidence. Kanaan, 163 Vt. at 405, 659 A.2d at 131. But where, as here, the court has failed to provide a sufficient analysis of substantial evidence that was critical to the State's case, affirming the court's decision is not deference but creation—the construction of an analysis the court has not given. While it is not the role of this Court "to reweigh the evidence," In re D.F., 2018 VT 132, ¶ 30, __ Vt. __, 204 A.3d 641, it is also not our role to assess the evidence in the first instance.

¶ 37. Affirming in these circumstances is particularly troubling given that it is M.E. who appeals the family court's decision and seeks protection. "CHINS proceedings are protective in nature and focus on the welfare of the child, the child's safety and permanency being the paramount concern." In re A.G., 2004 VT 125, ¶ 17, 178 Vt. 7, 868 A.2d 692; see also In re A.S., 2016 VT 76, ¶ 10, 202 Vt. 415, 150 A.3d 197 ("Children are obvious objects of the state's concern when abuse or neglect is claimed, and a parent's right to the care, custody, and control of one's children, although fundamental, is not absolute and may be overcome by the State's interest, under the doctrine of parens patriae, in ensuring the protection and care of its juveniles." (quotation

omitted)).  To protect children, it is essential that a family court adequately examine substantial evidence that is presented and adopt findings regarding that evidence.  That did not happen here.  I respectfully dissent.

_____
Chief Justice